**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MERIDA CAPITAL PARTNERS III LP**                                    :
                                                                     :
      Plaintiff,                       :    Case No. _____
                                                                     :
      - against -                       :    **COMPLAINT**
                                                                     :
**JACOB FERNANE, PACIFIC LION LLC,**                                 :    **JURY TRIAL DEMANDED**
**LIQUEOUS LP, "ABC CORP." and "JOHN DOES**                          :
**1-3"**                                                             :
                                                                     :
      Defendants,                       :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

        Plaintiff Merida Capital Partners III LP ("Merida" or "Plaintiff"), for its complaint against

defendants Jacob Fernane ("Fernane"), Pacific Lion LLC ("Pacific Lion"), Liqueous LP

("Liqueous"), ABC Corp. and John Does 1-3 (collectively, the "Defendants"), alleges as follows:

**NATURE OF THE ACTION**

        1.     This case arises from a complex fraudulent scheme perpetrated by Defendant

Fernane and various co-conspirators who facilitated his theft of assets from securities market

participants such as Merida.  As Merida discovered only too late, Fernane is a serial fraudster who

successfully bilked Merida out of no less than $3.2 million in cash and securities.

        2.     With the intention of using his wholly-owned entities Pacific Lion and Liqueous to

shield himself from liability, Fernane duped Merida into entering a sham repurchase agreement

whereby Merida surrendered valuable publicly-traded securities at a deeply-discounted price,

based on the false representations that those securities would remain in a segregated account titled

in Merida's name, that Merida would retain beneficial ownership of the securities for the entire

time they were under Fernane's control, and that the securities would be returned promptly to

Merida if it paid a premium and an agreed repurchase price in the future.

3.      In reality, Fernane converted and sold Merida's securities almost immediately, and one year later, added insult to injury by pocketing $1.625 million of Merida's money – without returning its securities – when Merida attempted to invoke the sham repurchase agreement.

4.      For months after Merida requested the return of its securities and paid for their prompt return, Fernane strung Merida along with a series of increasingly improbable excuses as to why Merida's securities could not be returned immediately, or simply disappeared for weeks on end, forcing Merida to continuously follow up regarding the whereabouts of its cash and securities.

5.      When Merida eventually indicated its intention to file this lawsuit after months of being strung along, Fernane retained counsel, who blamed Merida for Fernane's misconduct, threatened to sue Merida (for intentional infliction of emotional distress upon Fernane, among other absurd claims) and offered to resolve the matter only on terms that would afford a multimillion-dollar windfall to Fernane.

6.      Fernane continues to hold Merida's cash and valuable securities hostage, and it is clear he has no intention of ever making Merida whole.  This lawsuit seeks to hold Fernane and his co-conspirators responsible for their fraud and recover no less than $3.2 million in stolen assets.

## THE PARTIES

7.      Plaintiff Merida is a Delaware limited partnership with its principal place of business located at 670 Milton Road, Rye, New York.

8.      Defendant Fernane is an individual residing in Miami, Florida.

9.      Defendant Pacific Lion is a Florida limited liability company with its principal place of business located at 7901 4th St. N., Suite 300, St. Petersburg, Florida 33702.

10.     Defendant Liqueous LP is a Delaware limited partnership with its principal place of business located in Florida.

11.     Defendant ABC Corp. is an entity whose identity is unknown to Plaintiff at this time and who participated in some or all of the acts described herein and derived benefit therefrom for which they are liable to Plaintiff.

12.     Defendants John Doe #1-3 are individuals whose identities are unknown to Plaintiff at this time and who participated in some or all of the acts described herein and derived benefit therefrom for which they are liable to Plaintiff.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)) and Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder.  This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

14.     This Court has personal jurisdiction over Defendants pursuant to New York Civil Practice Law & Rules §§ 301 and 302(a) because Defendants have acted and transacted business within this District with respect to the facts and circumstances underlying this dispute.

15.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), in that a substantial part of the events giving rise to the claims alleged herein occurred in New York.

## FACTUAL ALLEGATIONS

### Fernane Baits the Hook

16.     Merida is a New York-based private equity fund with a focus on investments in the medical and adult-use cannabis industries in the U.S. and abroad.  In early 2023, Merida was seeking to raise capital in connection with new opportunities, and its then-COO Daniel Lipton sought out brokers to assist in that effort.

17.     As part of those efforts, Lipton connected with William Stern, a broker he had worked with previously on an alternative financing deal that had fallen through, and another broker, Stephen Sheinbaum.  Stern and Sheinbaum introduced Lipton to Fernane, representing that Fernane, through Pacific Lion, was a legitimate provider of securities lending services.

18.     A financing arrangement was quickly negotiated between Merida on the one hand and Fernane and Pacific Lion on the other hand. Stern and Sheinbaum, at all times, acted as mouthpieces and agents for Fernane, directly relaying information from Fernane to Merida.

19.     Unknown to Merida at the time, Fernane never intended to honor any arrangement with Merida and, with the assistance of Stern and Sheinbaum, was simply scheming to defraud Merida of no less than $3.2 million in cash and securities over the next year.

**Fernane Gains Control of Merida's Securities Through a Sham Agreement**

20.     On June 26, 2023, Lipton on behalf of Merida, and Fernane, purportedly on behalf of Pacific Lion, executed a Stock Repurchase Agreement, which was amended by Merida and Pacific Lion on July 13, 2023 "as a means of confirming the final closing values, net proceeds and the premium payment schedule" (the "Amendment").  The Stock Repurchase Agreement and the Amendment are together referred to as the Beneficial Ownership Retention Repurchase Option ("BORRO").  As Merida later came to understand through subsequent investigation, the BORRO was not a real contract, but merely an artifice to enable Fernane to steal securities from Merida.

21.     The BORRO, as amended, provided that Pacific Lion would "purchase" 415,000 shares of Green Thumb Industries Inc. ("GTI") (the "Shares") from Merida for a purchase price of $1,612,275.  This represented a 50% discount on the value of the Shares.  The BORRO provided that the Shares would be placed into a custodial account created by Merida and that Pacific Lion, which Fernane controlled, would be granted full control over the account and broad authority to execute transactions including buying, selling or hedging the Shares, provided that any such

4

transactions were effectuated by way of borrowing or hypothecation of the Shares in a separate account established by Pacific Lion.

22.     Merida was expected to retain beneficial ownership and legal title of the Shares and the option to "repurchase" the Shares upon expiration of the BORRO.  To maintain its beneficial ownership of the Shares, Merida agreed to make four equal premium payments (essentially interest payments) to Pacific Lion during the term of the BORRO, each in the amount of $13,099 for a sum of $52,398.

23.     Fernane falsely represented to Merida that it could exercise its "option" to repurchase the Shares by providing written notice of its election to Pacific Lion within thirty days of the expiration of the BORRO, which was to occur on or about July 14, 2024.  Pacific Lion would then be obligated to coordinate the necessary steps to facilitate the repurchase transaction. The repurchase price was set forth in the Amendment as $1,612,275.

24.     Specifically, during the brief negotiations period prior to execution of the BORRO, Stern represented to Lipton, on behalf of Fernane, that Merida would be permitted to "exercise[e] a repurchase in which [Merida is] repurchasing the entire position at the principal balance" at the end of the term of the proposed deal.  He further represented that Merida would "pay quarterly premium payments over the 12 months and maintain the set equity maintenance level. Upon good standing with the agreement, [Merida] can exercise the repurchase option or roll it into new financing. The repurchase is the equivalent to the draw [Merida] received ($3.81/share) for a total of $2,132,700."

25.     In reliance on the above and other, similar false representations made by Fernane directly and through Stern and Sheinbaum that Merida would be able to "repurchase" the Shares

after one year, Merida executed the BORRO and took the necessary steps to effectuate transfer of the Shares after receiving the $1,531,662 "Purchase Price" from Pacific Lion.

26.     Specifically, Merida opened a brokerage account at Lazarus Securities Pty Ltd. ("Lazarus"), an Australia-based prime brokerage, and on July 14, 2023 transferred 339,482 GTI shares (valued at approximately $2,600,432) into that account from Odyssey Transfer and Trust Company ("Odyssey"), the transfer agent for GTI.  On July 24, 2023, Merida transferred the remaining 75,518 GTI shares (valued at approximately $513,522) into its Lazarus account from another account at Haywood Securities ("Haywood").

27.     As Merida would later discover, without Merida's knowledge or consent, and at Fernane's direction, Lazarus immediately processed a borrow transaction of 415,000 GTI shares from Merida's Lazarus account to another account in the name of "Liqueous LP"—contrary to the requirement of the BORRO that "should [Pacific Lion] seek to execute ordinary trades there shall be a formal hypothecation and/or arranged borrow of the Purchased Shares from [Merida's] account into [Pacific Lion's] designated account with the prime broker."

28.     Upon information and belief, prior to processing the borrow transaction of the Shares to Liqueous' account, Lazarus received a copy of the BORRO from Fernane.  Lazarus knew or should have known that it was assisting Fernane in perpetrating a fraud on Merida, because it transferred the Shares to Liqueous' account, rather than one in the name of Pacific Lion, in plain contravention of the terms of the BORRO.

29.     Upon information and belief, at Fernane's direction, Liqueous either retained the Shares, transferred them to another individual or entity or sold them and transferred the proceeds to Fernane.

30.     Upon information and belief, Fernane transferred some portion of the proceeds of his sale or hypothecation of the Shares to persons and/or entities that are as of yet unknown to Merida either as compensation for their assistance in his fraud or to thwart Merida's ability to recover the value of its securities.

**Fernane Victimizes Merida Yet Again**
**By Taking $1.625 Million From Merida and Providing Nothing in Return**

31.     On June 14, 2024, Merida provided written notice to Pacific Lion consistent with the terms of the BORRO, by emailing Fernane, copying Sheinbaum and Stern, and stating that "[p]ursuant to Section C.3 of Exhibit C to the Stock Repurchase Agreement Amendment, this email serves as our notice to repurchase the . . . Shares. The repurchase price is $1,625,374 (which includes the final interest payment of $13,099). Please confirm receipt of this notice."[1]

32.     Merida further asked whether Fernane would "release the . . . Shares early" if Merida "deliver[ed] the full repurchase price prior to July 14" and when Merida could "expect receipt of the . . . Shares upon delivery of the repurchase price."

33.     Fernane responded on June 18, confirming "receipt for your notice to repurchase" and stating that he was "happy to try and accommodate an early and expedited redelivery. As soon as payment is received we will start working on unwinding our hedge and transferring the shares at your direction."  Fernane represented that "[t]ypically, it's around 5 trading sessions for us to unwind a hedge which as mentioned we can start as early as once we've received a wire confirm."

34.     As Merida would discover in the coming months, these representations were false. Fernane never intended to "transfer[] the shares" to Merida and the fiction of needing to "unwind

---

[1] The closing share price of GTI shares on June 14, 2024 was $11.40, and the approximate value of the Shares as of that day was equivalent to $4,731,000.

a hedge" over "5 trading sessions" was just the first of Fernane's never-ending excuses for failing to return the stolen Shares.

35.     Upon information and belief, Fernane no longer possessed the Shares and accordingly had no ability to transfer them back to Merida.  Rather, the second stage of Fernane's fraudulent scheme was unfolding, during which Fernane would retain Merida's Repurchase Payment and interest payments in addition to the Shares he had already received and liquidated.

36.     Over several weeks following Merida's notice of its intention to repurchase the Shares, Merida's Chief Financial Officer ("CFO") attempted to coordinate with Fernane to arrange transfer of the Shares back to Merida but was repeatedly stymied by Fernane's misrepresentations, obstructions and delay tactics.

37.     On or around July 8, 2024, Merida's General Counsel emailed Fernane stating that Merida had "generated the cash to repurchase our 415k shares of GTI" and requesting "wire instructions and other necessary details to finalize the transaction."  Fernane responded that day representing that he would "prepare a formal repurchase letter which will include the wire instructions" and requested "a letter of instruction directing where the shares need to be sent."

38.     In response to Fernane's request for a letter of instruction, Merida's CFO informed him that Odyssey would again serve as the transfer agent, and the Shares should be transferred to Merida's account with Odyssey.  Fernane was also informed that Odyssey would "require a medallion-guaranteed transfer form" to process the transaction.

39.     On or about July 9, Fernane provided wire instructions and a transfer instruction template to Merida.  That same day, Merida's CFO returned the executed transfer instruction and provided confirmation that the purchase price of $1,625,374 had been wired to Pacific Lion.

40.     On or about July 15, Fernane confirmed his receipt of the "repurchase proceeds and sufficient instruction for delivery of the shares."  Fernane represented that he would "follow up" and asked if any additional documentation would be needed so he could "have the back office also prepare it."

41.     Having now stolen both Merida's Shares and its money, Fernane sought to further delay and provide time to cement his fraudulent scheme by again enlisting his agents Stern and Sheinbaum to act as a go-between for the parties and create a patina of good faith efforts to return the Shares.

42.     Merida did not hear back from Fernane regarding the transfer of the Shares until on or about July 23, when Sheinbaum asked Fernane to "[p]ls advise on the status of the return of the shares," and Fernane responded, at 10:47AM, that he would "be at [his] desk in an hour to send over the" necessary paperwork.

43.     After Fernane again failed to respond as promised, Merida's CFO emailed Fernane at 5:32PM asking if he could provide "an update on the share transfers."  Fernane did not respond or provide the promised paperwork.

44.     The next day, on July 24, 2024, Merida's CFO emailed Fernane, Sheinbaum and Stern stating that Merida had "been notified by both Odyssey and Haywood that they have not been contacted by Pacific Lion re these transfers" and asking "[w]here do we stand with this and what is the holdback? We need to get our shares back in our account as soon as possible."

45.     Sheinbaum responded, requesting that Fernane "[p]lease advise asap."  Fernane did not respond.  On July 25, Merida's CFO followed up again, asking Fernane and Sheinbaum for an "ETA on when we should expect the shares back."

46.     That same day, Merida's General Counsel emailed Stern, saying that Stern needed "to step in and get this process moving for us immediately. Communication with Jacob hasn't been efficient enough and it was our understanding that it would only take 5 days. The withholding of our shares is messing with our budget and is unacceptable at this point. Jacob needs to prioritize the return of our shares before we must look into other recourse. The infrequent communication is creating concern that something is amiss. Please respond ASAP." Stern continued the pattern of delay and represented that he had "called Jacob and texted him as well" and was "waiting for him to get back to me." Merida's General Counsel reiterated in his response to Stern that "[w]e need a substantive update with exact timing on when the shares will be returned. We wired money to Jacob over 2 weeks ago and, to our knowledge, there hasn't been any contact with our transfer agent or broker yet."

47.     On July 29, 2024, Merida's General Counsel informed Sheinbaum that there was "[s]till no headway" with Fernane or transfer of the Shares. He explained that there were "concerns about whether our shares are in [Fernane's] control." He also noted that "[Stern] has said that he'll drive to Jacob's office tomorrow morning to get some answers for us and hopefully provide a concrete timeline of the return of our shares." Sheinbaum responded that he would "endeavor to sync up with [Stern] and Jacob tomorrow."

48.     On July 30, 2024, Merida's CFO tried another approach and emailed a representative from Lazarus, requesting "the most recent custody statement as of current date for Merida Capital Partners III LP holding of GTI." Lazarus confirmed that as of July 29, 2024, there was "no shareholding in [Merida's] account" of GTI shares. The custody statement shared by Lazarus confirmed that the Shares were in fact transferred to Liqueous, rather than to Pacific Lion, on July 24, 2023—the same day the Shares were fully deposited by Merida into its account.

49.     On July 31, Sheinbaum emailed Merida's CFO and General Counsel stating that he had "exchanged several emails and texts with Jacob" over the past month but had not heard from him recently.  Sheinbaum also explained that he had "not been able to catch up with [Stern] the past several days" but would try to do so to coordinate efforts to reach Fernane.  Later that day, Stern responded on the same email chain saying that he had driven to Fernane's offices the day before but "could not reach [Fernane]" as "he was not there."  Merida's General Counsel responded asking what Stern and Sheinbaum recommended as next steps, considering that Fernane "is difficult to get a hold of and appears to be evasive whenever someone does get in touch with him."  Stern and Sheinbaum, again continuing a pattern of evasion and delay in furtherance of Fernane's fraudulent scheme, did not respond.

50.     On August 1, Merida's CFO followed up with Stern and Sheinbaum on their efforts to contact Fernane, and the next day Sheinbaum further delayed, saying he had "been trying to get on the phone with [Stern] for the past 48 hours. We keep missing each other."  Stern and Sheinbaum, despite Merida's General Counsel asking for updates and stating that Merida had not heard "anything substantive from either of you," did not respond again until August 5, when Stern stated that he was "not sure what if anything else I can do."

51.     Following the further delay caused by Stern and Sheinbaum, on August 9, 2024, Merida's CFO emailed a representative from Odyssey, the transfer agent responsible for effectuating the transfer of the Shares from Pacific Lion to Merida, clarifying information needed for the transfer.  On August 12, the representative informed Merida that Odyssey required "an original medallion-guaranteed Withdrawal form to complete" the transfer.  The same day, Merida's CFO added Fernane to the email chain, informing him of the requirement and requesting that he

"coordinate directly with Odyssey re the forms required to complete this transfer. This is urgent as [*sic*] extremely important for Merida to finalize the transfer this week."

52.     Merida's General Counsel reached out to Stern and Sheinbaum on August 14, requesting help on getting an update from Fernane and stating that "[w]e're about 5 weeks out from wiring Jacob the funds. While it seems like some forward progress has been made, the transfer still isn't done and Jacob has no sense of timely responses . . . I don't know how else to express the extreme frustration here. What can I do to make clear how incredibly urgent this is?" Stern and Sheinbaum did not respond, despite Merida's General Counsel following up on his request the next day.

53.     Fernane did not respond until nine days later, on August 21.  Rather than providing the medallion-certified withdrawal form Odyssey required, Fernane questioned the need for the form at all—"With a signed letter of intent and the signed confirmation of the 1933 Rule 904 letter are you staying [*sic*] that you can not match the DWAC once the broker has initiated the transfer to Odyssey? I've processed 100+ DWAC's and I've never hdmh [*sic*] that requested that required two medallions C l [*sic*]."

54.     Odyssey repeatedly explained to Fernane what forms were required to effectuate the transfer and even agreed "to accept a PDF for the [withdrawal] form without a medallion to complete this request," to which Fernane falsely represented on August 23 that "[t]he request ha[d] been submitted for processing,"

55.     Upon information and belief, the request was never "submitted for processing" as represented by Fernane.

56.     Having again created the illusion of a good faith effort to return the Shares, Fernane proceeded to ignore emails from Merida for another 5 days.

57.     On August 28, Merida's General Counsel emailed Fernane asking "[h]ow is this still not resolved? Every time there appears to be forward progress, you seem to disappear . . . It's approaching two months that you've had our money and there has yet to be a substantive step forward to returning our shares.  Our understanding is that completing the necessary paperwork is a matter of *minutes* and you're yet to get this done."  In response to this email, Fernane and Stern participated in a phone call with Merida's General Counsel later that day.

58.     After the phone call, Stern emailed Fernane saying  "please see attached [DWAC Withdrawal Instruction Form] please send back to Chris [the Odyssey representative]." Merida's General Counsel responded to that email saying "Jacob – Thanks for chatting earlier. Per [Stern's] note, please complete the form today and return to Odyssey for processing."  Merida's General Counsel later noted that in the referenced phone conversation, Fernane agreed "to provide some form of confirmation from [his] broker that the 415k [Shares] are in an account with Six [Fernane's broker]."

59.     When Fernane did not complete the form or respond by the following day (August 29), Merida's General Counsel asked for an update "ASAP," stating Merida was "under the impression that this would be taken care of yesterday."  Again, Fernane disappeared and did not respond to any of Merida's attempts to contact him until September 2, when he again failed to provide the transfer forms to Odyssey or the promised confirmation from his broker that the Shares were still in his account.

60.     Merida's General Counsel continued to request updates on the promised confirmation from Fernane's broker that the Shares were being held in Fernane's account. Specifically, on September 2, Merida's General Counsel emailed Fernane stating "[w]e also want confirmation from your broker that our shares are being held by them. This evidence should be

very easy to provide . . . we want the evidence we've requested and that you already promised to deliver."

**Fernane Cements His Fraudulent Scheme**
**<u>Through Additional Misrepresentations</u>**

61.     Fernane continued to delay and distract away from the fact that he had retained Merida's Repurchase Payment and failed to deliver the Shares by making further misrepresentations to Merida.

62.     On September 10, 2024, Fernane again represented on a phone conversation with Merida's General Counsel that he would provide confirmation from his broker that the Shares were in his custody.  He again failed to provide that confirmation.

63.     Fernane then attempted to blame his delay in returning the Shares on the procedures Odyssey required to make the transfer, as described in further detail below.  Fernane therefore suggested that the transfer be made using a different broker, and the parties agreed that Fernane would open an account with Haywood, funded with enough cash to purchase 415,000 GTI shares that he would subsequently transfer to Merida.

64.     Fernane was introduced to representatives of Haywood by Merida on or around September 11, 2024.  On that same day, Fernane represented that he had "assigned a new account opening at Haywood today."

65.     On September 18, 2024, Fernane emailed Merida's General Counsel, purporting to provide "a full update outlining where we [are] at in the current transaction."  In that update, Fernane represented that when originally requesting the medallion-certified form, he "emailed the DTC [Depository Trust Company] team twice to see if they saw the DWAC in the system. dtc@odyssey who we've always used for DWAC's did not respond."  He further represented that he "missed the 72 hour window and would need to resubmit with a new medallion. As mentioned

if you have a contact to provide this we would try again but we had just paid nearly 1 month of interest to obtain the first medallion."  Fernane provided no evidence that any of this had actually occurred.

66.     In that same "update," Fernane represented that he was "actively progressing with the plan to ledger the shares through Haywood," rather than through Odyssey.  He represented that "[o]ur VP of Operations has prepared the data room and is ready for my initial kickoff call," and that "[t]he process for the Haywood account opening is being started today and expect it everything to be completed within 2-3 days of the account opening."

67.     None of these representations were true. Haywood contacted Merida's General Counsel the following day, September 19, confirming they "ha[d]n't heard back" from Fernane after "call[ing] and email[ing] multiple times."  Between September 18 and September 24, Merida's General Counsel followed up with Fernane at least seven times, requesting Fernane "get the account open without delay" and "get[] confirmation of our shares being held at [Six]," making clear that Merida "need[ed] an update immediately" and "need[ed] to see that some immediate action can actually happen."

68.     Fernane did not respond to any of those emails and, as of September 23, had not actually submitted account opening paperwork to Haywood despite his representations on September 18 that "[t]he process for the Haywood account opening is being started today" and that he was "actively progressing with the plan to ledger the shares through Haywood."

69.     Upon information and belief, Fernane never opened an account at Haywood.

70.     To date, despite repeated representations of his intent to do so imminently, Fernane has not returned the Shares to Merida and has instead retained the Shares (or the proceeds of their

sale), the Premium Payments and the Repurchase Payment, defrauding Merida of no less than $3.2 million in assets.

71.    Upon information and belief, Stern and Sheinbaum knew of Fernane's fraudulent scheme against Merida and participated in the fraud by introducing Fernane to Merida, by facilitating the negotiation and drafting of the BORRO, and by participating in Fernane's evasion and delay tactics upon Merida's payment of the Repurchase Payment.

72.    Upon information and belief, Fernane knew and intended from the outset of the parties' negotiations that he and/or his affiliated entities Pacific Lion and Liqueous would retain the Shares (or the proceeds of their sale) and the Premium Payments, and, in the event that Merida elected to "repurchase" the Shares and transferred the Repurchase Payment to Fernane and his affiliated entities, Fernane would retain the Repurchase Payment too, thus depriving Merida of more than 100% of the value of its Shares.  His fraudulent scheme was a total success.

73.    Fernane's conduct has all the hallmarks of a Ponzi scheme, as to which Merida likely is only the latest in a long string of victims.

**Fernane's History of Fraudulent Conduct Involving Pacific Lion and Liqueous**

74.    Through subsequent investigation, Merida learned that Fernane, through his affiliated entities Pacific Lion and Liqueous, is alleged to have committed a series of similar thefts that have been the subject of lawsuits filed in Florida, New York, Delaware and California.

75.    For example, an action was filed in the United States District Court for the Southern District of Florida[2] alleging that Fernane fraudulently withdrew 2.5 million shares from the plaintiff's account without authorization and subsequently employed delay and distraction tactics, similar to those employed here, to retain the fraudulently transferred shares.  The plaintiff there

---

[2] *Mid-Castle Dev. Ltd. v. Liqueous LP and Jacob Fernane*, Case No. 1:24-cv-20511 (S.D. Fla. Feb. 9, 2024).

alleged that Fernane would take days to respond to requests for more information, "confirmed that . . . Defendants . . . continued to hold Plaintiff's 2.5 million shares" and stated that he "intended to, and could, return the shares to Plaintiff," despite never doing so or providing reliable documentation demonstrating that he possessed the plaintiff's shares.

76.     Later in the case it was revealed through subpoenaed documents that "after taking possession of the 2.5 million shares on or around December 13, 2023, Defendants immediately sold about 1 million shares over the counter, while transferring the remaining 1.56 million shares to other brokerages," which were then also "immediately dumped."[3]  The proceeds of those sales were subsequently "gambled . . . on ultra-high-risk options trading" and lost or transferred to "numerous bank accounts," including one account in the name of Fernane's father.

77.     As is particularly relevant here, the plaintiffs in *Mid-Castle* asserted that "within a month after Defendants took the shares from Plaintiff, all 2.5 million shares were gone, and the proceeds were dissipated or squirreled away through numerous financial intermediaries. Yet, ***for months after*** they dumped stolen stock and hid proceeds, Defendants consistently represented to the Court and Plaintiff that they still had the shares, and even signed a settlement agreement agreeing to return them. As recently as their filings in June, Defendants ***still*** claimed that the shares would be returned shortly . . . It is now clear that all these falsehoods, including the settlement agreement, were merely tactics to buy time."

78.     Another action was filed against Fernane and Pacific Lion in the United States District Court for the Southern District of California,[4] alleging that Pacific Lion "is a toxic lender that specializes in predatory lending practices," and that Fernane "regularly causes Pacific Lion to

---

[3] *Mid-Castle Dev.*, Case No. 1:24-cv-20511 (ECF No. 89).
[4] *Humbl, Inc., v. Pacific Lion LLC, Jacob Fernane and Robert Hymers*, Case No. 24-cv-0495 (S.D. Cal. Mar. 13, 2024).

enter into contracts without intending that Pacific Lion will render its agreed performance."  It was alleged that one of Fernane's known accomplices and partner in Liqueous, Robert Hymers, negotiated a deal whereby Pacific Lion provided short-term funding to the plaintiff over the course of six months and consolidated the Plaintiff's company's legacy debt in exchange for shares in plaintiff's company.  The plaintiff alleged that "[i]mmediately after Pacific Lion successfully extracted the accessible value from [plaintiff]'s legacy debt, Pacific Lion stopped making the required payments" and that "[a]s though ripping off [plaintiff] for millions of dollars by entering into the Agreement with no intention of performing was not enough, [Pacific Lion] further harmed [plaintiff] by falsely claiming that Pacific Lion made required payment to a third party, . . . entitl[ing] Pacific Lion to convert debt into additional shares of [plaintiff]." The plaintiff alleged that "Pacific Lion then received those shares and sold them into the market in contravention of federal securities laws."

79.     Fernane and Pacific Lion were further accused of similar conduct in an action filed in the Supreme Court of the State of New York for the County of Monroe.[5]  That action alleged that the plaintiff agreed to pay Fernane and Pacific Lion for the right to receive $116,000 of their future receivables, which would be drawn by plaintiff from a specific bank account.  Shortly after receiving the purchase price, Fernane and Pacific Lion allegedly "blocked Plaintiff's access to the Account thereby preventing Plaintiff from making the agreed upon ACH withdrawals," effectively pocketing the plaintiff's purchase payment and immediately depriving the plaintiff of over $100,000 of the receivables it had bargained for.

---

[5] *Pearl Delta Funding, LLC v. Pacific Lion LLC and Jacob Fernane*, Index No. E2023007980 (Sup. Ct., Monroe County, July 24, 2023).

80.     Most recently, Fernane and Liqueous were alleged to have swindled a class of SPAC stockholders out of millions.[6]  In that case, the proceeds of the SPAC's IPO were held in a certain trust account for the purpose of funding a business combination and their use was subject to the terms of the SPAC's charter and trust agreement.  When it became clear that a business combination would not occur and the SPAC would need to be liquidated – upon which the SPAC shareholders (Class A shares) would allegedly receive $11.52/share while the founders and directors (Class B shares) would receive nothing – the SPAC founder and director defendants entered into a deal with Liqueous and Fernane.  Plaintiffs alleged that defendants, in violation of the SPAC charter and trust agreements, agreed to combine the SPAC with a shell company owned by Fernane "that had a zero prospect of closing" while simultaneously issuing "nearly 1.7 million new Class A shares to Liqueous."[7]

81.     Plaintiffs alleged that "[a]fter swindling the SPAC's transfer agent into issuing the [Class A] shares . . . Liqueous dumped approximately 724,000 newly issued shares into the open market for proceeds of approximately $7.5 million, intermingling the invalid shares with shares issued in the IPO."  Nasdaq was notified of the fraudulent trades and "indefinitely halted trading in the SPAC's shares and eventually delisted the shares from the exchange."[8]

82.     Fernane managed to continue defrauding the SPAC shareholders in a second transaction with the director defendants, by which they sought to combine the SPAC with a second shell company owned by Fernane, Invest Inc.  After that transaction did not close, instructions were given to liquidate the SPAC and distribute funds from the trust account *pro rata* to public stockholders.  But Fernane was not done extracting as much as he could from the SPAC—Liqueous

---

[6] *Meteora Capital Partners v. Canna Global, et al.*, Case No. 2025-0060 (Trans. ID 75521804) (Del. Ch. Jan. 27, 2025).
[7] *Id.*
[8] *Id.*

filed two actions against the SPAC "seeking to extract *millions of dollars more* from the SPAC, including from the Trust Account if necessary, despite the enormous damages Liqueous had already caused."[9]

83.     In another case, Fernane was named as a "key witness" against a defendant company accused of committing *a nearly identical fraudulent scheme to the present case.*[10] *Avantgarde* involved an alleged scheme where the defendant company would "typically loan[] amounts of approximately 50% of the market value of shares transferred" by the counterparty and "retain[] substantial proceeds" and "interest payments . . . even after funding each loan."[11] Potential "borrowers" would be provided a loan agreement outlining the process for transferring the shares to the defendant company's custodial brokerage account.  The plaintiff in *Avantgarde* alleged that in the three transactions it completed with the defendant company, the defendant company began dumping the shares it received from the plaintiff the very same day.  Fernane was described by plaintiff's counsel as a former Vice President of the defendant company and as a key witness whose testimony would "outline[] how [defendant] defrauded everyone and explain[] how the fraud functioned."[12]  Another filing by the defendants noted that Fernane was a disgruntled ex-employee who had married and then divorced the daughter of one of the defendants, and previously had expunged a "criminal record for felony financial crimes."[13]

84.     Of further note in this case, Fernane also has a history of weaponizing arbitration agreements to further his fraudulent schemes and delay tactics.  For example, in the *Mid-Castle* action, shortly after the filing of the complaint, the parties executed a settlement agreement wherein

---

[9] *Id.* (emphasis in original).
[10] *Avantgarde Group S.P.A. v. Stock Loan Solutions, LLC*, Case No. 2:24-cv-137 (ECF No. 34, at ¶ 7) (D. Utah).
[11] *Id.* (ECF No. 3).
[12] *Id.* (ECF No. 34, at ¶ 7; (ECF No. 37, at 2).
[13] *Id.* (ECF No. 37, at 2).

Fernane promised to return the shares at issue in that case (while knowing he did not possess the shares or their proceeds). Fernane then immediately defaulted and moved to dismiss the complaint for lack of jurisdiction and to compel arbitration,[14] asserting that "[t]he parties entered into a settlement agreement," which "contain[ed] an arbitration clause, mandating FINRA arbitration in the event of any disputes." Arguing that "[t]he parties ha[d] a dispute over the terms of the settlement agreement," Fernane insisted that "the court must compel the dispute to arbitration."

85.    While the plaintiff in that case subsequently "commenced a FINRA arbitration to enforce the terms of the settlement agreement,"[15] Fernane failed to provide additional consents to FINRA in order to allow its administration of the arbitration.[16] In the midst of failing to provide the consents, Fernane also terminated his counsel, prompting "Plaintiff['s] concern that Defendants may simply have been running out the time while they undertake measures to negate the power any relief the Court may issue" and run out the deadline to commence the FINRA arbitration.

**Stern and Sheinbaum's Own History of Fraud and Other Assorted Misconduct**

86.    From February 1988 until February 2006, Sheinbaum was a lawyer licensed to practice in the State of New York.

87.    On February 17, 2006, the Appellate Division of the Supreme Court of New York, First Department ordered the disbarment of Sheinbaum in connection with his felony conviction of two counts of conspiracy to commit wire fraud in violation of 18 USC § 371. On November 8, 2007, the First Department granted the Departmental Disciplinary Committee's request to strike Sheinbaum's "name from the roll of attorneys and counselors-at-law in the State of New York."[17]

---

[14] *Mid-Castle Dev.*, Case No. 1:24-cv-20511 (ECF No. 31).
[15] *Id.* (ECF No. 42).
[16] *Id.* (ECF No. 69, at 6-7) (explaining that the parties did not meet FINRA requirements but instead agreed to commence a JAMS arbitration).
[17] *Matter of Sheinbuam*, 47 A.D.3d 49, 51 (1st Dep't 2007).

The First Department noted that Sheinbaum admitted in his plea allocution "that between June and November 2001, he conspired with others to defraud 1) his employer of commissions of almost $80,000 and 2) the Bangladesh Ministry of money and property in excess of the statutory requirement by making materially false and fraudulent representations and promises."[18]

88.      Sheinbaum's nefarious activity appears to have continued well beyond 2006.  In 2019, a claim of criminal usury was alleged against Sheinbaum and his business, Circadian Funding, LLC in connection with a personal loan and mortgage made to the plaintiff for an allegedly usurious interest rate in excess of 200%.[19]  The plaintiff alleged that he "was contacted by Stephen Sheinbaum of CIRCADIAN FUNDING, LLC . . . with an offer for a personal loan . . . of $110,000.00 . . . secured by a mortgage on [plaintiff's] personal residence."[20]  The plaintiff further alleged that Sheinbaum represented plaintiff would be provided with an opportunity to review the closing documents with his attorney, but instead only provided the plaintiff with six hours to review and execute the documents before "the loan offer would no longer be valid."[21]

89.      Stern and his company Venture Group have had at least two judgments entered against them in connection with defaulting under agreements made for the purchase of receivables.[22]  In *Fundamental Capital*, Stern entered into a merchant agreement whereby the plaintiff purchased the right to receive over $200,000 in future receivables for a purchase price of $150,520.  After taking plaintiff's payment of the purchase price, Stern failed to allow plaintiff to collect the full amount of receivables, instead leaving them short almost $90,000.  Stern entered

---

[18] *Id.* at 50-51.
[19] *Adoni v. World Business Lenders, LLC et al.*, Index No. 620617/2019 (Dkt. No. 1) (Sup. Ct., Suffolk County, Oct. 18, 2019).
[20] *Id.* ¶¶ 8-9.
[21] *Id.* ¶¶ 10-13.
[22] *Fundamental Capital LLC v. Venture Group Capital LLC and William D. Stern*, Index No. 504101/2023 (Sup. Ct., Kings County, 2023); *Fundfi Merchant Funding, LLC v. Venture Group Capital, LLC and William David Stern*, Index No. 528872/2022 (Sup. Ct., Kings County, 2022).

into a settlement agreement with the plaintiff, agreeing to pay the outstanding amount according to a payment schedule.[23]  Stern also breached that agreement, and plaintiff accordingly sought judgment for the outstanding amount, which was entered February 3, 2023.[24]

90.     Similarly, in *Fundfi Merchant Funding*, Stern and Venture Group executed two agreements with the plaintiff where the plaintiff purchased (i) $142,000 of receivables for a purchase price of $100,000 and (ii) $72,500 of receivables for $50,000.  Again, after taking plaintiff's payments, Stern failed to allow the plaintiff to collect the full amount of receivables, leaving them short almost $90,000 and $57,000, respectively.  Stern and Venture Group defaulted in the action and judgment in favor of the plaintiff for the outstanding amount, reasonable attorneys' fees, and interest was entered on January 5, 2023.[25]

**Merida's Counsel Demands Return of the Shares**
**and Fernane's Counsel Continues the Pattern of Resistance and Obstruction**

91.     On November 18, 2024, Merida's counsel sent a letter to Fernane demanding confirmation that Fernane still held the Shares and evidence of concrete steps taken to effectuate return of the Shares before November 25. Merida's counsel noted Merida's belief that Fernane's repeated delays and failure to return the shares or funds were a subterfuge designed to deprive Merida of the Shares and additional funds, and indicated that absent compliance with the demand, Merida would seek to enforce its rights to recover them.

92.     On November 25, rather than responding to Merida's counsel or providing the demanded evidence of the Shares and transfer, Fernane's counsel Robert Heim of Tarter Krinsky & Drogin LLP contacted Merida's General Counsel directly.  Merida's counsel thereafter engaged with Mr. Heim in a final attempt to negotiate a return of the Shares.

---

[23] *Fundamental Capital*, Index No. 504101/2023, Dkt. No. 9.
[24] *Id.* at Dkt. No. 10.
[25] *Fundfi*, Index No. 528872/2022, Dkt. No. 10.

93.     Mr. Heim purported to be speaking on behalf of Liqueous – not Fernane or Pacific Lion.  Although Heim claimed to still be "in the process of reviewing the relevant documents" and speaking to his client, Heim immediately cited to provisions of the BORRO purporting to require disputes to be submitted to binding arbitration in Fort Lauderdale, Florida.  Tellingly, in repeated subsequent communications, Heim continued to state that he represented Liqueous, but not Fernane or Pacific Lion.

94.     Despite Merida's good faith effort to effectuate a resolution involving return of the Shares, Fernane's counsel refused to acknowledge any wrongdoing by Fernane, instead blaming the delay on Merida's purported "negligence" in the course of its earlier correspondence with Fernane while he was pretending to effectuate a return of the Shares.

95.     And although Fernane still wrongfully holds the Shares (or more likely the proceeds thereof) and Merida's Premium Payments and Repurchase Payment, Fernane's counsel threatened *Merida* with a countersuit in response to any fraud claim, asserting (falsely) that Merida "has engaged in a campaign of extreme verbal harassment against Jacob Fernane during a time that Merida and its personnel knew that Mr. Fernane was supporting his father during a heart surgery" and asserting that in response to any lawsuit to recover damages for Fernane's fraud, "Liqueous will assert counter-claims against Merida and its personnel to recover the damages it and its principal have suffered including, but not limited to, claims for fraudulent inducement, damages for the transaction costs Liqueous has already paid and damages for intentional infliction of emotional distress [against Fernane]."

96.     Subsequent to making his specious threats against Merida, Fernane's counsel continued to make sham efforts to return the Shares, corresponding with Odyssey representatives by email on December 6, 2024 and requesting that Odyssey "transfer 415,000 shares of [GTI] back

to [Merida]."  In a damning response confirming the success of Fernane's fraudulent scheme, Odyssey responded as follows: "Our apologies, but we have been unable to locate an account registered to the name or address you have provided below."

**Pacific Lion and Liqueous Are Merely Alter Egos**
**Of Fernane Used to Perpetrate Fraud Against Merida**

97.     Fernane is the manager of Pacific Lion and controls the entity such that it does not have an independent existence, and Pacific Lion is merely a façade for Fernane.  Based on Fernane's well-documented use of Pacific Lion to engage in wrongful conduct, including fraud against Merida and other individuals and entities, Merida reasonably believes that Fernane organized Pacific Lion as an instrument of his fraudulent schemes and in an attempt to shield himself from liability for that same conduct.  Upon information and belief, Fernane has wrongfully siphoned funds from Pacific Lion or otherwise commingled Pacific Lion's funds with his own personal funds.

98.     Fernane is a principal of Liqueous, along with his known accomplice, Robert Hymers.[26]  Fernane exercises control over Liqueous such that it does not have an independent existence and the two are alter egos.  Liqueous is also merely a façade for Fernane.  Fernane has similarly used Liqueous to engage in wrongful conduct against other individuals and entities, and Fernane has exerted his control over Liqueous and Pacific Lion in conjunction to transfer funds and dump shares in furtherance of his fraudulent schemes and other wrongful conduct.  Merida reasonably believes that Fernane also organized Liqueous as an instrument of his fraudulent schemes and in an attempt to shield himself from liability for that same conduct.  Upon information

---

[26] Merida's investigation has revealed that Hymers, a former accountant, also is a convicted criminal, having entered a plea of *nolo contendere* to a count of identity theft in 2011 in connection with a conspiracy that resulted in felony charges against former Mets baseball star Lenny Dykstra.   *See* https://www.cnn.com/2011/10/19/us/lenny-dykstra-plea/index.html.  Hymers' arrest and conviction led to the suspension of his accounting license by the California Board of Accountancy.  *See https://www.cba.ca.gov/cba/discipline/actions/d1-2012-9.pdf.*

and belief, Fernane has wrongfully siphoned funds from Liqueous or otherwise commingled Liqueous' funds with his own personal funds.

99.     It is clear that Pacific Lion and Liqueous are merely interchangeable alter egos of Fernane, as Fernane used Pacific Lion to enter the BORRO but (as the Lazarus statements reveal) proceeded immediately to transfer the Shares to an account in the name of Liqueous.

## FIRST CAUSE OF ACTION
### Violations of Section 10(b) of the Securities Exchange Act and Rule 10b-5 Promulgated Thereunder
### (Against Fernane, Pacific Lion and Liqueous)

100.     Plaintiff repeats and realleges the allegations above as if fully set forth herein.

101.     As set forth above, Fernane and his agents continuously and repeatedly made false and material misrepresentations and omissions to Merida.

102.     Fernane, either himself or through his agents Stern and Sheinbaum, falsely and materially misrepresented to Merida that:

a.     prior to entering the BORRO, Merida would be permitted to "exercise[e] a repurchase in which [Merida is] repurchasing the entire position at the principal balance" at the end of the term of the proposed deal;

b.     prior to entering the BORRO, Merida would "pay quarterly premium payments over the 12 months and maintain the set equity maintenance level. Upon good standing with the agreement, [Merida] can exercise the repurchase option or roll it into new financing. The repurchase is the equivalent to the draw [Merida] received ($3.81/share) for a total of $2,132,700";

c.     that the Shares would not be sold except by way of a borrow or hypothecation transaction by which they would be deposited in an account held in Pacific Lion's name;

d.     prior to paying the Repurchase Payment, Fernane would "release the [Shares] early" if Merida "deliver[ed] the full repurchase price prior to July 14";

e.     prior to paying the Repurchase Payment, Merida could "expect receipt of the [Shares] upon delivery of the repurchase price";

f.     prior to paying the Repurchase Payment, "[a]s soon as payment is received [Fernane and Pacific Lion] [would] start working on unwinding our hedge and transferring the shares at your direction;"

g.     "[t]he request" to complete Odyssey's withdrawal form to complete the share transfer to Merida "ha[d] been submitted for processing" on August 23, 2024;

h.     Fernane would "provide some form of confirmation from [his] broker that the 415k [Shares] are in an account with Six [Fernane's broker]";

i.     Fernane "assigned a new account opening at Haywood [on September 11, 2024]";

j.     Fernane would deposit funds to an escrow account at Haywood for the purchase of 415,000 GTI shares for transfer to Merida;

k.     when originally requesting the medallion-certified form, Fernane "emailed the DTC [Depository Trust Company] team twice to see if they saw the

DWAC in the system. dtc@odyssey who we've always used for DWAC's did not respond";

l.      Fernane "paid nearly 1 month of interest to obtain the first medallion" for the Odyssey withdrawal form;

m.      Fernane was "actively progressing with the plan to ledger the shares through Haywood," rather than through Odyssey;

n.      Pacific Lion's "VP of Operations . . . prepared the data room and [was] ready for [the] initial kickoff call" with Haywood; and

o.      "[t]he process for the Haywood account opening [was] being started [on September 18, 2024]" and Fernane "expect[ed]. . . [the share transfer] to be completed within 2-3 days of the account opening."

103.    Each of those representations were false when made, and Fernane knew they were false at all times, or at best recklessly disregarded the truth of their statements.

104.    Each of those representations were made as part of an overarching scheme to deprive Merida of the full value of the Shares, the Premium Payments and the Repurchase Payment and then delay indefinitely Merida's efforts to recover its assets.

105.    Merida's transfer of the Shares and its subsequent payment of the Premium and Repurchase Payments were predicated on these false representations.  But for Fernane's material misrepresentations, Merida would not have transferred the Shares or paid the Premium or Repurchase Payments.

106.    Fernane has wrongfully retained the Shares, the Premium Payments and the Repurchase Payment.  Upon information and belief, Fernane has caused Liqueous to either sell the

Shares or transfer them to another brokerage account of persons and/or entities currently unknown to Merida without Merida's knowledge or consent.

107.    Fernane employed this scheme to defraud Merida, acting in concert with others to falsely induce Merida to transfer the Shares, and with the intent that Merida would pay the Premium Payments and the Repurchase Payment based on the same false premises.

108.    Additionally, Fernane's actions, practices, and course of conduct in dealing with Merida operated as a fraud or deceit upon Merida in connection with the purchase or sale of securities, as Fernane's goal throughout was to induce Merida to transfer the Shares to him and his controlled entities in reliance upon his fraudulent misstatements and omissions.

109.    As a result of this fraud, Merida has been damaged in an amount to be determined at trial, but believed to be in excess of $3,200,000.

**SECOND CAUSE OF ACTION**
**Fraud**
**(Against Fernane, Pacific Lion and Liqueous)**

110.    Plaintiff repeats and realleges the allegations above as if fully set forth herein.

111.    As set forth above, Fernane, either himself or through his agents Stern and Sheinbaum, falsely represented to Merida that

   a.    prior to entering the BORRO, Merida would be permitted to "exercise[e] a repurchase in which [Merida is] repurchasing the entire position at the principal balance" at the end of the term of the proposed deal;

   b.    prior to entering the BORRO, Merida would "pay quarterly premium payments over the 12 months and maintain the set equity maintenance level. Upon good standing with the agreement, [Merida] can exercise the repurchase option or roll it into new financing. The repurchase is the

equivalent to the draw [Merida] received ($3.81/share) for a total of $2,132,700";

c.       that the Shares would not be sold except by way of a borrow or hypothecation transaction by which they would be deposited in an account held in Pacific Lion's name;

d.       prior to paying the Repurchase Payment, Fernane would "release the [Shares] early" if Merida "deliver[ed] the full repurchase price prior to July 14";

e.       prior to paying the Repurchase Payment, Merida could "expect receipt of the [Shares] upon delivery of the repurchase price";

f.       prior to paying the Repurchase Payment, "[a]s soon as payment is received [Fernane and Pacific Lion] [would] start working on unwinding our hedge and transferring the shares at your direction;"

g.       "[t]he request" to complete Odyssey's withdrawal form to complete the share transfer to Merida "ha[d] been submitted for processing" on August 23, 2024;

h.       Fernane would "provide some form of confirmation from [his] broker that the 415k [Shares] are in an account with Six [Fernane's broker]";

i.       Fernane "assigned a new account opening at Haywood [on September 11, 2024]";

j.       Fernane would deposit funds to an escrow account at Haywood for the purchase of 415,000 GTI shares for transfer to Merida;

k.      when originally requesting the medallion-certified form, Fernane "emailed the DTC [Depository Trust Company] team twice to see if they saw the DWAC in the system. dtc@odyssey who we've always used for DWAC's did not respond";

l.      Fernane "paid nearly 1 month of interest to obtain the first medallion" for the Odyssey withdrawal form;

m.      Fernane was "actively progressing with the plan to ledger the shares through Haywood," rather than through Odyssey;

n.      Pacific Lion's "VP of Operations . . . prepared the data room and [was] ready for [the] initial kickoff call" with Haywood; and

o.      "[t]he process for the Haywood account opening [was] being started [on September 18, 2024]" and Fernane "expect[ed]. . . [the share transfer] to be completed within 2-3 days of the account opening."

112.    Each of those representations were false when made, and Fernane knew they were false.

113.    Fernane made the false representations intending to induce Merida to transfer the Shares to him and make the Premium Payment and Repurchase Payment to him.

114.    Merida reasonably relied on the representations made by Fernane when transferring the Shares to its Lazarus account, when making the Premium Payments and when making the Repurchase Payment.

115.    As a result of this fraud, Merida has been damaged in an amount to be determined at trial, but believed to be in excess of $3,200,000.

116.    In addition, in light of Fernane's intentional and wanton violation of Merida's rights and/or his reckless disregard for those rights, the Court should impose punitive damages.

117.    Further, as a result of this fraud, Merida is also entitled to recover its attorneys' fees.

### THIRD CAUSE OF ACTION
**Fraudulent Inducement**
**(In the Alternative, against Fernane and Pacific Lion)**

118.    Plaintiff repeats and realleges the allegations above as if fully set forth herein.

119.    As set forth above, Fernane, purporting to act as a representative of Pacific Lion, made fraudulent representations to induce Merida to enter the BORRO.

120.    Specifically, Fernane, either himself or through his agents Stern and Sheinbaum, represented that:

     a.    prior to entering the BORRO, Merida would be permitted to "exercise[e] a repurchase in which [Merida is] repurchasing the entire position at the principal balance" at the end of the term of the proposed deal;

     b.    prior to entering the BORRO, Merida would "pay quarterly premium payments over the 12 months and maintain the set equity maintenance level. Upon good standing with the agreement, [Merida] can exercise the repurchase option or roll it into new financing. The repurchase is the equivalent to the draw [Merida] received ($3.81/share) for a total of $2,132,700"; and

     c.    that the Shares would not be sold except by way of a borrow or hypothecation transaction by which they would be deposited in an account held in Pacific Lion's name.

121.    These representations were false when made, and Fernane knew they were false.

122.    Fernane made these false representations intending to induce Merida to enter into the BORRO.

123.    Merida reasonably relied on the representations made by Fernane when entering the BORRO.

124.    As a result of this fraud, Merida has been damaged in an amount to be determined at trial, but believed to be in excess of $3,200,000.

125.    In addition, in light of Fernane and Pacific Lion's intentional and wanton violation of Merida's rights and/or their reckless disregard for those rights, the Court should impose punitive damages.

126.    Further, as a result of this fraud, Merida is also entitled to recover its attorneys' fees.

### FOURTH CAUSE OF ACTION
**Breach of Contract**
**(In the alternative, against Pacific Lion)**

127.    Plaintiff repeats and realleges the allegations above as if fully set forth herein.

128.    In the alternative, to Claims I through III above, to the extent that the Court finds that the BORRO constitutes a valid and enforceable contract between Merida and Fernane and Pacific Lion, Pacific Lion is liable for breach of the BORRO.

129.    New York law governs the BORRO.

130.    Merida has complied with its obligations under the BORRO.

131.    Fernane and Pacific Lion's actions, as set forth above, have breached the BORRO by failing to transfer the Shares back to Merida upon timely provided written notice of Merida's election to repurchase and payment of the Repurchase Payment.

132.    As a result of this breach, Merida has been damaged in an amount to be determined at trial, but believed to be in excess of $3,200,000.

133.    Further, as a result of this breach, Merida is also entitled to recover its attorneys' fees.

## FIFTH CAUSE OF ACTION
**Conversion**
**(Against Fernane, Pacific Lion, Liqueous,**
**John Does #1-3 and ABC. Corp.)**

134.    Plaintiff repeats and realleges the allegations above as if fully set forth herein.

135.    As set forth above, through fraud and deceit, Fernane, Pacific Lion, Liqueous and/or other persons and entities unknown to Merida at this time converted the Shares and the Repurchase Payment provided by Merida for legitimate purposes and appropriated it to themselves.

136.    Despite multiple demands therefor and multiple unfulfilled promises to return the Shares and the Repurchase Payment, Fernane, Pacific Lion and Liqueous have refused to return them.

137.    As a result, Merida has suffered damages in an amount to be determined at trial, but believed to be in excess of $3,200,000.

## SIXTH CAUSE OF ACTION
**Unjust Enrichment**
**(Against Fernane, Pacific Lion and Liqueous,**
**John Does #1-3 and ABC. Corp.)**

138.    Plaintiff repeats and realleges the allegations above as if fully set forth herein.

139.    As set forth above, Fernane, Pacific Lion, Liqueous and/or other persons and entities unknown to Merida at this time used the Shares, the Premium Payments and the Repurchase Price to enrich themselves at Merida's expense.

140.    It is against equity and good conscience to permit Fernane, Pacific Lion, Liqueous, John Does #1-3 and ABC Corp. to retain the benefit of Merida's shares and money.

141.    As a result of Fernane, Pacific Lion and Liqueous' conduct, Merida has suffered damages in an amount to be determined at trial, but believed to be in excess of $3,200,000.

**SEVENTH CAUSE OF ACTION**
**Money Had and Received**
**(Against Fernane, Pacific Lion and Liqueous,**
**John Does #1-3 and ABC Corp.)**

142.    Plaintiff repeats and realleges the allegations above as if fully set forth herein.

143.    As set forth above, Merida transferred the Shares to Fernane, Pacific Lion and Liqueous and paid them the Premium Payments and Repurchase Payment.

144.    Fernane, Pacific Lion, Liqueous and/or other persons and entities unknown to Merida at this time benefitted from receipt of the Shares, the Premium Payments and the Repurchase Payment.

145.    Under principles of equity and good conscience, Fernane, Pacific Lion and Liqueous should not be permitted to keep the Shares, the Premium Payments and the Repurchase Payment.

146.    As a result of Fernane, Pacific Lion and Liqueous' conduct, Merida has suffered damages in an amount to be determined at trial, but believed to be in excess of $3,200,000.

**WHEREFORE**, Merida respectfully demands judgment as follows:

(a) Compensatory damages in the sum of at least $3,200,000 plus pre-judgment interest; and

(b) Punitive and exemplary damages in the Court's discretion; or

(c) In the alternative, to the extent that the Court finds that the BORRO was an actual and enforceable agreement, specific performance in the form of an order directing Pacific Lion to comply with its obligations to deliver to Merida 415,000 GTI Shares, or compensatory damages as the Court may deem appropriate; and

(d) Interest and the costs and disbursements incurred by Merida in this action, including

    reasonable attorneys' fees; and

(e) Such other and further relief as may be just and proper.

Dated: February 11, 2025

**KLEINBERG, KAPLAN, WOLFF & COHEN, P.C.**

By:_____
       Joshua K. Bromberg
       Taeler K. Lanser

500 Fifth Avenue
New York, New York 10110
Telephone: (212) 986-6000
Facsimile: (212) 986-8866
jbromberg@kkwc.com
tlanser@kkwc.com

*Attorneys for MERIDA CAPITAL PARTNERS III LP*